# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

MATTHEW H. SWYERS,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　　　　)　　Civil Action No. 1:16cv15
　　　　　　　　　　　　　　　　　　　)
UNITED STATES PATENT &　　　　　　)
TRADEMARK OFFICE, *et al.*,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)
_____)

## MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES PATENT & TRADEMARK OFFICE'S MOTION TO DISMISS

　　　　　　　　　　　　　　　　　　DANA J. BOENTE
　　　　　　　　　　　　　　　　　　UNITED STATES ATTORNEY

　　　　　　　　　　　　　　　　　　DENNIS C. BARGHAAN, JR.
　　　　　　　　　　　　　　　　　　Assistant U.S. Attorney
　　　　　　　　　　　　　　　　　　2100 Jamieson Avenue
　　　　　　　　　　　　　　　　　　Alexandria, Virginia 22314
　　　　　　　　　　　　　　　　　　Telephone: (703) 299-3891
　　　　　　　　　　　　　　　　　　Fax:　　　(703) 299-3983
　　　　　　　　　　　　　　　　　　Email:　dennis.barghaan@usdoj.gov

DATE: March 22, 2016　　　　　　　ATTORNEYS FOR DEFENDANTS

OF COUNSEL:　　Tracy Kepler
　　　　　　　　　United States Patent and Trademark Office

## INTRODUCTION

It is difficult to overstate the importance of intellectual property in our modern society. The United States Patent and Trademark Office ("USPTO") is charged with not only regulating intellectual property issues, but also with ensuring the integrity and fairness of the system itself – including those practitioners who represent the intellectual property interests of others before the USPTO.  To this end, as the Federal Circuit has held, Congress and the USPTO have created a comprehensive scheme governing the regulation of those practitioners, including a process by which the USPTO investigates the conduct of a practitioner, and if necessary, the Director of USPTO's Office of Enrollment and Discipline ("OED") files and ultimately prosecutes charges of unprofessional conduct.  That scheme provides a practitioner with extensive procedural protections, including the ability to present oral testimony and written evidence before an independent hearing examiner on the record, and an avenue for administrative and judicial review of any adverse decision.

Plaintiff Matthew Swyers is a practitioner who has represented thousands of individuals and entities before the USPTO in trademark matters.  After an investigation into his conduct as a trademark practitioner, and a finding of probable cause to believe he had engaged in substantial misconduct by an independent committee of USPTO officials, the OED Director has filed a lengthy complaint against plaintiff that presents *eight* separate counts of violations of USPTO's professional responsibility rules.  Plaintiff will now have the ability to defend himself against those charges before an independent hearing officer (an administrative law judge outside of the USPTO), and to appeal any adverse decision to the USPTO Director, and then – if necessary – to this Court.

Despite this exclusive scheme for administrative and judicial review of USPTO disciplinary decision-making, plaintiff now asks this Court to intervene while his disciplinary proceeding remain pending, and to enjoin the USPTO from continuing with charges that are premised on his alleged failure to respond to requests for information ("RFI") that he maintains were unconstitutional.  Leaving aside the fact that plaintiff eschewed the opportunity to challenge the propriety of the RFIs during the investigation via a specific review mechanism that the USPTO created for exactly that purpose, see 37 C.F.R. § 11.2(e), plaintiff can present his constitutional arguments during the ongoing administrative process in defense of the very charges that he asks this Court to enjoin.  But more importantly, the Supreme Court has held that federal courts lack jurisdiction to entertain claims for equitable relief against ongoing administrative proceedings when Congress has – as here – created a specific scheme within a particular context for administrative and judicial review.  Accordingly, any Article III judicial review of the propriety of the disciplinary charges against plaintiff must await a final administrative decision from the USPTO Director, and be presented to this Court pursuant to 35 U.S.C. § 32.

Nevertheless, nothing about the RFIs in question ran afoul of plaintiff's Fourth and Fifth Amendment rights.  As Judge Motz provided in a separate opinion for the Fourth Circuit nearly a decade ago, an individual does not enjoy any procedural due process protections with respect to investigative fact-finding by an agency; rather, it is only when an agency actually seeks to impose a sanction (here, by filing disciplinary charges against a practitioner) that due process attaches.  Nor were any of the RFIs so over-broad – especially in relation to the USPTO's scope of inquiry – to come within the ambit of the Fourth Amendment.

## STATUTORY AND REGULATORY BACKGROUND

In this action, plaintiff asks this Court to exercise judicial review in the middle of the intricate and comprehensive scheme through which – pursuant to Congress's express authorization – the USPTO investigates putative misconduct on the part of those who represent others before the agency and, in appropriate cases, seeks discipline against those individuals that are alleged to have acted in contravention of the USPTO's rules of professional conduct ("RPC"). It is thus appropriate at the threshold to provide a detailed description of that scheme, including the several opportunities that are available for administrative and judicial review of USPTO decision-making and action in the disciplinary context.

## I.   USPTO'S AUTHORITY TO REGULATE THE CONDUCT OF PRACTITIONERS BEFORE THE AGENCY

Congress has vested the USPTO with the authority to promulgate regulations "govern[ing] the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Office." 35 U.S.C. § 2(b)(2)(D); see also Haley v. Under Sec'y of Commerce for Intellectual Prop., --- F. Supp. 3d ---, 2015 WL 5277880, at *8 (E.D. Va. Sept. 8, 2015). The Federal Circuit has repeatedly recognized that this provision grants broad authority to the USPTO to govern the conduct of proceedings before the USPTO, and to govern the recognition and conduct of practitioners who appear before the USPTO. See, e.g., Lacavera v. Dudas, 441 F.3d 1380, 1383 (Fed. Cir. 2006).

Pursuant to this authority, the USPTO has enacted its own Rules of Professional Conduct ("RPC"), see 37 C.F.R. §§ 11.101-.901, which govern the conduct of all practitioners engaged in practice before the USPTO. The USPTO has also, based on 35 U.S.C. §§ 2(b)(2)(D) and 32, promulgated specific regulations governing the investigation of alleged violations of the RPC on the part of practitioners, and proceedings geared towards adjudicating both whether practitioners

have engaged in professional misconduct, and if so, the appropriate sanction for such

misconduct.  See 37 C.F.R. §§ 11.2; 11.19-11.60.

## II.     THE DISCIPLINARY PROCESS

### A.     DISCIPLINARY INVESTIGATIONS

The disciplinary process commences when the Director of USPTO's Office of

Enrollment and Discipline ("OED") receives information suggesting professional misconduct on

the part of a practitioner, and initiates an investigation.[1]

1.     Prior to 2004, there existed scant formal legal guidance concerning OED's investigations

into allegations of misconduct.  Indeed, USPTO's regulations simply provided that the OED

Director's duties included the "[c]onduct [of] investigation into possible violations of the

Disciplinary Rules."  37 C.F.R. § 10.2(b)(2); see also id. § 10.131(a) (providing that the

"Director is authorized to investigate possible violations of Disciplinary Rules by practitioners").

No specific regulatory provision identified either the types of investigatory tools at OED's

disposal, or those mechanisms that were available to a practitioner to challenge decisions made

or actions taken by OED during the course of an investigation.  And in all candor, in early 2004,

the Fourth Circuit criticized these gaps in USPTO's regulatory structure.  See Goldstein v.

Moatz, 364 F.3d 205, 217-18 (4th Cir. 2003).  But, contrary to the allegations contained in

plaintiff's complaint here, Complaint, ¶1, since the Fourth Circuit's decision in Goldstein, the

USPTO has now filled those gaps.

2.a.     Initially, the USPTO's regulations now clearly provide that OED officials can – as a part

of their investigation into potential misconduct on the part of a practitioner – "request

---

[1]Such allegations of misconduct can come to the attention of the OED Director, see 37
C.F.R. § 11.2(b) (delineating duties of OED Director), in any number of ways.  For instance, an
individual outside USPTO – e.g., a client, court, or other agency – can report such allegations to
OED, and USPTO personnel can similarly identify potential misconduct for investigation.  See
37 C.F.R. § 11.22(b).

information and evidence regarding possible grounds for discipline of a practitioner," 37 C.F.R.

§ 11.22(f)(1), colloquially known as "requests for information" or "RFIs."  OED can exercise

this authority to request information from the "grievant" (*i.e.*, the individual who tendered the

complaint of alleged misconduct), the member him or herself, or "[a]ny person who may

reasonably be expected to provide information and evidence needed in connection with the

grievance or investigation."  Id.  As the USPTO noted in promulgating these new rules to the

public, "[r]equesting information and documents from practitioners . . . enables the OED

Director, and ultimately the [USPTO], to efficiently and effectively ascertain whether grounds

for disciplining a practitioner exist."  Changes to Representation of Others Before the United

States Patent and Trademark Office, 72 Fed. Reg. 9196, 9200 (Feb. 28, 2007).  And for this

reason, consistent with the vast majority of state bar rules, USPTO's RPC provide that if a

practitioner "*knowingly* fail[s] to respond to a *lawful* demand or request for information" not

protected by the rule on client confidences, such represents an independent ethical violation for

which the practitioner may be disciplined.  37 C.F.R. § 11.801(b) (emphasis added); see also VA.

R. PROF. COND. 8.1(c) (providing that Virginia practitioners "shall not . . . fail to respond to a

lawful demand for information from an admissions or disciplinary authority").[2]

Additionally, OED can request information directly from a client of the practitioner under

investigation – even if that client is not simultaneously the individual who complained about the

practitioner's conduct – but only after following carefully-circumscribed regulatory procedures

designed to protect against unnecessary intrusion into the sanctity of the attorney-client

relationship.  Id. § 11.22(f)(2).  In this respect, OED may only seek information from a non-

complaining client of the practitioner in question if (a) the practitioner himself consents, or (b)

---

[2]Of course, the highlighted terms above – especially within the context of the instant
action – are significant, as the USPTO must establish that the practitioner *knowingly* failed to
respond to a request for information that was *lawful*.

"upon a finding by a Contact Member of the Committee on Discipline [a group of independent

USPTO employees outside of OED] . . . that good cause exists to believe that the possible

ground for discipline alleged has occurred with respect to non-grieving clients."  Id.

b.      But recognizing other concerns about potential investigatory overreaching articulated by

the Fourth Circuit in Goldstein, the USPTO also endeavored to create a remedial mechanism

through which practitioners (or others) could obtain review of OED decision-making and action

– including its issuance of requests for information – during disciplinary investigations:

> A party dissatisfied with any action or notice of any employee of the Office of
> Enrollment and Discipline during or at the conclusion of a disciplinary investigation shall
> seek review of the action or notice upon petition to the OED Director.

Id. § 11.2(e).  In order to ensure that the investigation remains on track, and that this petition

process is not utilized by practitioners to preclude the USPTO from filing a disciplinary

complaint within the relevant limitations period,[3] any such petition must be filed within thirty

(30) days of the decision or action challenged.  See id.  Once the OED Director adjudicates the

petition, the party in question may seek administrative appellate review with the USPTO

Director.  See id.  And importantly, if still dissatisfied, the party may seek Article III judicial

review of the USPTO Director's final decision on the petition in an appropriate federal court.

See id.; Changes to Representation of Others Before the United States Patent and Trademark

Office, 77 Fed. Reg. 64190, 64191-92 (Oct. 18, 2012) (noting that practitioners dissatisfied with

investigatory action on the part of OED personnel must exhaust these available "administrative

remedies before seeking relief under the Administrative Procedure Act").  As such, in the wake

of the Fourth Circuit's decision in Goldstein, the USPTO has created specific mechanisms for

---

[3]Pursuant to federal statute, USPTO must commence any disciplinary proceeding within
10 years of the allegedly-unprofessional conduct, or within one year of the USPTO's knowledge
of that conduct.  See 35 U.S.C. § 32.

practitioners to obtain review of requests for information issued by OED during its investigation of a given practitioner.

###### B.   DISCIPLINARY PROCEEDINGS

1.      If, at the conclusion of its investigation, OED believes that a practitioner has engaged in unethical conduct, it cannot *sua sponte* charge that practitioner with a violation of the RPC and seek a disciplinary sanction.  Rather, it must present its investigatory findings to a panel the "Committee on Discipline" – an independent group of attorneys at USPTO outside and independent of OED.[4]  See 37 C.F.R. §§ 11.23(b)(1); 11.32.  That panel reviews the evidence, and determines whether there is probable cause to believe that the practitioner has engaged in conduct violative of the RPC.  See id. § 11.32.

If the panel makes this necessary probable cause finding, the OED Director commences disciplinary proceedings by filing and serving a complaint against the practitioner.  See id. §§ 11.32; 11.34-35.  The practitioner then has at least thirty (30) days to file an answer to the complaint, see id. § 11.36, and of course, is entitled to legal representation during disciplinary proceedings, see id. § 11.40.

2.      Disciplinary proceedings against USPTO practitioners are conducted and adjudicated by completely independent "hearing officers" that are outside the immediate supervision of either the USPTO or OED Directors, see 35 U.S.C. § 32; 37 C.F.R. § 11.39; typically, Administrative Law Judges ("ALJs") from other Executive Branch agencies.  And these proceedings, although administrative in nature, bear the hallmarks of traditional litigation, along with the trappings of due process afforded to litigants in Article III courts.  See 35 U.S.C. § 32 (requiring notice and

---

[4]In particular, the USPTO Director is responsible for appointing the Committee on Discipline, the governing regulations mandate that no member of the committee "shall report directly or indirectly to the OED Director or any employee designated by the USPTO Director to decide disciplinary matters."  37 C.F.R. § 11.23(a).

an opportunity to be heard before a practitioner may be sanctioned).  The OED Director bears the "burden of proving the violation by clear and convincing evidence."  Id. § 11.49.

Hearing officers have extensive independent authority over disciplinary proceedings, including the issuance of rulings on "motions or other requests" and evidentiary issues during the course of the proceedings.  See id. §§ 11.39(c); 11.43.  Although full-fledged discovery is not authorized as a matter of course, either the OED or a practitioner may move the hearing officer to authorize discovery in the form of reasonable interrogatories and requests for production of documents.  See id. § 11.52(a).  Additionally, the hearing officer presides over oral hearings – akin to a trial – at which she receives both evidence and legal argument on the record concerning the charges from both OED and the practitioner.  See id. § 11.44.

USPTO's regulations provide that a hearing officer should issue an initial decision on the disciplinary charges within nine (9) months of the date on which the initial complaint is filed, unless circumstances dictate otherwise.  See id. § 11.39(d).  That initial decision – akin to bench trials before this Court – must include findings of fact and conclusions of law.  See id. § 11.54(a)(1).  And if the hearing officer concludes that the OED Director has borne his burden to establish the practitioner's disciplinary infraction, the decision is also to identify the appropriate sanction for the misconduct.  See id. § 11.54(a)(2).

3.      If the practitioner is dissatisfied with the hearing officer's resolution of the OED Director's disciplinary complaint, he has several avenues for administrative and judicial review.

a.      Within thirty days of the hearing officer's decision, the practitioner may notice an appeal of that decision to the USPTO Director, including a brief that – consistent with the Federal Rules of Appellate Procedure – identifies the grounds of error on the part of the hearing officer.  See id. § 11.55.  OED is entitled to file a responsive brief, and the practitioner a reply brief.  See id.

Once briefing is completed, the USPTO Director "has authority to conduct a *de novo* review of the factual record," and "may affirm, reverse, or modify the initial decision or remand to the hearing officer for such further proceedings as [she] may deem appropriate." Id. § 11.56. Subsequent to the USPTO Director's appellate decision, the regulations afford a practitioner who remains dissatisfied a single opportunity to request reconsideration. Id. § 11.56(c).

b.      Once the USPTO Director's appellate decision becomes final, Congress explicitly provided a single, streamlined vehicle for Article III review of USPTO disciplinary proceedings, and in so doing, placed strict limitations on the venue in which that review can be had:

> The United States District Court for the Eastern District of Virginia, under such conditions and upon such proceedings as it by its rules determines, may review the action of the Director upon the petition of the person so refused recognition or so suspended or excluded.

35 U.S.C. § 32. As the Federal Circuit has held, § 32 serves as the exclusive means by which a USPTO practitioner can obtain judicial review of the agency's disciplinary decisions, and that such serves as part of the "'orderly administrative mechanism' for review" of such issues. See Franchi v. Manbeck, 972 F.2d 1283, 1288-89 (Fed. Cir. 1992).

## **FACTUAL BACKGROUND & PROCEDURAL HISTORY**[5]

1.      Plaintiff Matthew Swyers is an attorney and trademark practitioner, and thus is currently authorized to practice before the USPTO in trademark and other non-patent matters. Complaint (Dkt. No. 1), ¶7; see also 5 U.S.C. § 500. In 2003, Plaintiff founded a law practice called "The Trademark Company," which engages in "the representation of clients in the protection of their

---

[5] The following discussion is based on the allegations contained within the four corners of the complaint, as well as both the attachments to that complaint and the other documents to which plaintiff refers in the same, all of which may be considered by this Court in adjudicating a motion to dismiss brought pursuant to Federal Rule 12(b)(6). See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). It is also well-settled that this Court can review materials outside of the complaint in addressing its own jurisdiction pursuant to Federal Rule 12(b)(1). See, e.g., Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004).

federal trademark and copyright rights."  Id. ¶13.  In the thirteen years since its founding, "the firm has represented over 20,000 clients," despite the fact that virtually none of the other individuals that plaintiff employed over that time were licensed attorneys.  Id. ¶¶16; 49.

2.        In August 2014, OED commenced an investigation into plaintiff's conduct in his representation of others before the USPTO in trademark matters.  Complaint, ¶18.  Consistent with the regulations governing disciplinary investigations, OED personnel – during its investigation – transmitted to plaintiff a series of RFIs.  Complaint, ¶¶18; 38; 44; 50; 54.  It is these RFIs that form the backbone for many of plaintiff's allegations in the instant complaint. Nowhere within the four corners of the complaint, however, does plaintiff once allege that he challenged the propriety of OED's transmission of any of these RFIs through the aforementioned procedure, see 37 C.F.R. § 11.2(e), explicitly created for that purpose.

a.        OED transmitted its first RFI to plaintiff on August 29, 2014.  Id. ¶18; see also Defendant's Exhibit ("DEX") 1.  These first RFIs explained to plaintiff that it had commenced an investigation after receiving information regarding his trademark application filings, and that OED was endeavoring "to develop all information relevant to the received information, including that information which may justify or exonerate the alleged actions."  Id. at 1.  The RFI also provided a list of the RPC that were "under possible consideration," so that plaintiff could generally understand the nature of the potential misconduct being investigated.  Id. at 3.

        And although plaintiff maintains that this – and other – RFIs contains "threats" concerning plaintiff's non-compliance with the RFIs, Complaint, ¶19, the actual text of the RFIs belie this contention.  Rather, the RFIs merely serve to remind a practitioner (such as plaintiff here) of what the RPC already mandate – i.e., that responding to RFIs is not discretionary – so that a practitioner cannot later feign ignorance:

It is a violation of the USPTO Rules of Professional Conduct to fail to cooperate with OED in an investigation of any matter before it, or to knowingly fail to respond to a request from OED.  See 37 C.F.R. § 11.801(b).  In addition, if you do not respond to this request for information, the Committee on Discipline may draw an adverse inference in making a determination under 37 C.F.R. § 11.23.  See Baxter v. Palmigiano, 425 U.S. 308 (1975).

DEX 1.

b.      After receiving plaintiff's response to its first set of RFIs, OED transmitted a second RFI

to plaintiff on December 19, 2014.  Id. ¶38 & ex.A.  And although it was not required to do so,

OED identified for plaintiff those trademark applications with which plaintiff was identified

about which OED had concerns.  Id. ex. A.  In a lengthy preface to this RFI, OED informed

plaintiff – with citations to the appropriate provisions of the USPTO's regulations and the

*Trademark Manual of Examining Procedure* – of exactly the ethical concerns that animated its

questioning.  Id. ex.A., at 13-14.  More specifically, OED explained that all documents submitted

to the USPTO in trademark matters must be *personally* signed by an authorized person –

including those signed electronically – and that an attorney's paralegal or assistant cannot be the

signatory; thus, OED was concerned that other individuals (*i.e.*, those employed by the

Trademark Company) were signing plaintiff's name electronically to documents without plaintiff

having done so personally as required.  Id.  The *four* queries transmitted in this second RFI, once

distilled to its essence, simply asked plaintiff to identify whether his electronic signature had

ever been affixed to an agency filing by another individual, in violation of USPTO signature

rules for trademark matters.

c.      Based on these continued concerns about plaintiff's non-attorney employees signing and

filing documents with the USPTO under his name, on March 30, 2015, OED transmitted its third

RFI to plaintiff.  Id. ¶44; DEX 2.  This RFI first asked plaintiff to confirm his prior responses

concerning whether other individuals electronically signed his name to trademark applications.

DEX 2.  And second, this RFI asked plaintiff to provide contact information for current and past employees of the Trademark Company.  DEX 2.  Two weeks later, plaintiff responded to this RFI simply by providing a laundry list of objections to the same, and disclosing information about one employee.  Id. ¶45 & ex.B.

d.      In May and June 2015, OED transmitted its final two RFIs to plaintiff.  Id. ¶¶50-54, exs. D-E.  These RFIs provided extremely-detailed information about the evidence that OED had garnered during its investigation to date, including plaintiff's own admissions, and the potential misconduct on plaintiff's part that OED was investigating.  And with respect to each series of requests, OED took the extraordinary step of providing a *justification* for its requests.  As but one example, OED's fourth RFI provided as follows, in pertinent part:

> Since January 2010, Mr. Swyers filed, or caused to be filed, thousands of trademark applications and trademark application submissions . . . in the Office.  Based on (a) Mr. Swyers' admission that he allowed other persons to sign his name to trademark applications and trademark application submissions filed in the Office under his electronic signature, and (b) Mr. Swyers' alleged ignorance of well-known USPTO signature rules, there is evidence suggesting that Mr. Swyers may have violated numerous ethical duties that he owes to [his] trademark applicants, to the Office, to the public, and to the legal profession.  Therefore, additional information is requested from Mr. Swyers as follows.

Id. ex. D., at 2.  This comes not from a disciplinary complaint, or from a closing argument before the Hearing Officer; rather, it is from a *RFI transmitted only to plaintiff* so that plaintiff can understand the basis for, and provided complete responses to, OED's inquiries.[6]

3.      OED's investigation has now closed.  And on March 11, 2016, after the Committee on Discipline found probable cause that plaintiff had violated the RPC, the OED Director – who is not a defendant here – commenced disciplinary proceedings against plaintiff through the filing of

---

[6]OED personnel also contacted some of plaintiff's clients to obtain information about his representation, and did so only after following the process mandated by 37 C.F.R. § 11.22(f)(2), and receiving permission from an independent member of the Committee on Discipline outside OED.

a fifty-six (56) page complaint against plaintiff with an ALJ at the United States Environmental

Protection Agency, who will serve as the independent hearing officer to adjudicate the charges.

DEX 3.  That complaint alleges *eight* separate counts against plaintiff:

- Count I – assisting others in engaging in the unauthorized practice of law; failure to review trademark applications and other trademark documents before filing; misrepresentations to clients;

- Count II – directing or allowing non-lawyer employees to sign or forge [plaintiff's] name to trademark applications and other trademark documents filed in the Office, in violation of the USPTO signature and certification rules;

- Count III – directing or allowing employees to sign or forge [plaintiff's] name to Section 2(f) declarations filed with the Office;

- Count IV – filing with the Office fraudulent or digitally altered specimens which did not reflect the mark's use in commerce; failure to inform the Office or clients or false or fraudulent specimens; failure to remedy or offer restitution;

- Count V –misrepresentation on website that a lawyer would prepare and review documents; collecting fees for trademark work done by non-lawyers when representing to clients that a lawyer would do the work.

- Count VI – failure to deposit client funds paid in advance into a client trust account;

- Count VII – impermissibly sharing legal fees with non-practitioners;

- Count VIII – witness tampering; failure to respond to lawful requests for information or cooperate with OED.

DEX 3.

More specifically, the complaint alleges, *inter alia*, that plaintiff "directed or allowed

non-lawyer employees of the Trademark Company to electronically sign or forge [his] electronic

signature to his clients' trademark application," and that plaintiff had "admitted to OED that he

did not review the trademark applications before they were filed."  Id. ¶¶34-35.  The complaint

also alleges that plaintiff's employees filed fraudulent specimens (*i.e.*, those that were not

actually being used in commerce) in support of trademark regulations, id. ¶¶91-117; 126-42, and

that at least two of plaintiff's former clients had provided evidence corroborating that plaintiff's employees had created and filed fraudulent specimens with the agency, id. ¶¶97; 182.

Of import to this action, only one part of a single count of the disciplinary complaint concerns plaintiff's responses to the RFIs.  Id. at 49-53.   In this respect, the complaint identifies that "[a] practitioner has an ethical duty to cooperate with OED and respond to its lawful requests for information."  Id. at 48 (citing 37 C.F.R. § 11.801(b)).  And that single count concerns only a few discrete issues with respect to plaintiff's responses:  (1) plaintiff's failure to provide client invoices (which would have revealed the firm employee who worked on the application in question); (2) plaintiff's failure to provide employment agreements (which would have revealed evidence of whether plaintiff was impermissibly sharing fees with non-lawyers); (3) plaintiff's failure to provide requested § 2(f) declarations (which would have provided evidence of the veracity of plaintiff's putative trademark filings); and (4) plaintiff's refusal to provide a privilege log to corroborate those materials that he was withholding on the basis of privilege.  Id. at 49-52.  The complaint avers that each of the OED's RFIs were "lawful."  Id.

These disciplinary proceedings are, therefore, in their infancy.  Plaintiff now has thirty days within which to answer the complaint.  After plaintiff files his answer, the ALJ – as hearing officer – will conduct the proceedings, consider motions, receive evidence, and issue an initial decision on the charges contained within the complaint.  Should plaintiff be dissatisfied with that initial decision, he will be afforded the opportunity to appeal the decision to the USPTO Director, who will issue a final administrative decision.  And as stated earlier, plaintiff can seek Article III judicial review in this Court from the USPTO Director's final decision.

## STANDARDS OF REVIEW

### I.     FEDERAL RULE 12(b)(1)

Federal Rule 12(b)(1) serves as the appropriate vehicle to challenge the court's subject

matter jurisdiction in a particular matter.  See, e.g., Coulter v. United States, 256 F. Supp. 2d

484, 486 n.3 (E.D. Va. 2003), aff'd, 90 Fed. Appx. 60 (4th Cir. 2004).  The plaintiff bears the

burden of establishing the court's subject matter jurisdiction, and although this Court may utilize

the allegations contained within the four corners of the plaintiff's complaint as *evidence* in

determining whether it possesses jurisdiction over a dispute, it may also consider other evidence

outside the pleadings if necessary.  See Richmond, Fredericksburg, & Potomac R.R. Corp. v.

United States, 945 F.2d 765, 768 (4th Cir. 1991); Coulter, 256 F. Supp. 2d at 486 n.3.

### II.    FEDERAL RULE 12(b)(6)

To the contrary, a motion pursuant to Federal Rule 12(b)(6) serves to test the legal

sufficiency of the plaintiff's complaint in relation to the factual averments he or she puts

forward.  Although a court must accept all well-pled allegations in adjudicating such a motion, it

need not credit allegations that are merely conclusory.  See Ashcroft v. Iqbal, 556 U.S. 662, 675

(2009). In Iqbal, the Supreme Court held as follows with respect to the proper standard of

review:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to "state a claim to relief that is plausible on its face."  A claim has
> factual plausibility when the plaintiff pleads factual content that allow the court to draw
> the reasonable inference that the defendant is liable for the misconduct alleged.

Id. at 678 (quoting Twombly, 550 U.S. at 570).  Accordingly, although (as before) a court is

required to adjudge the factual averments contained within a complaint against the substantive

law governing the claim, now "where the well-pleaded *facts* do not permit the court to infer more

than the *mere possibility* of misconduct," the complaint fails.  Id. at 679 (emphasis added).

## **ARGUMENT**

Plaintiff's instant complaint presents two constitutional claims:  (a) the RFIs violated plaintiff's Fifth Amendment rights to procedural due process, ostensibly because – in plaintiff's erroneous view – there is a "complete absence of any means to challenge the RFIs[]," Complaint, ¶¶1; 67; and (b) the RFIs "amount[] to an unreasonable search within the meaning of the Fourth Amendment of the United States Constitution."  Id. ¶70.  From these claims, against the USPTO, plaintiff asks this Court to insert itself into the ongoing disciplinary proceedings before the independent hearing officer by entering an injunction precluding OED from continuing with charges against plaintiff for failing to respond to the allegedly unlawful RFIs:

> Swyers asks this Court to enjoin Defendants on a preliminary and permanent basis from the enforcement of charges of violations of disciplinary rules based in whole or in part upon the failure of Swyers to answer to the OED's satisfaction RFIs that violate Swyers' constitutional rights.

Id. ¶77.

## II.     **THIS COURT LACKS JURISDICTION OVER PLAINTIFF'S REQUEST FOR JUDICIAL INTERRUPTION OF AN ONGOING ADMINISTRATIVE PROCEEDING**

The gravamen of plaintiff's request for injunctive relief in this Court is that any disciplinary charge against plaintiff based upon his purported failure to respond to putatively-unlawful RFIs would be unfounded, and that this Court should judicially-intervene and eliminate those charges immediately.  But disciplinary proceedings against plaintiff on these (and many other) grounds have just commenced, and plaintiff – pursuant to the streamlined process of administrative and judicial review that Congress has mandated – will have a full and fair opportunity to present his arguments to the hearing officer, and then (if necessary) to the USPTO Director, and ultimately to this Court.  Plaintiff's injunctive demand thus asks this Court to insert itself prematurely into this ongoing process and thus to allow him to circumvent Congress's

desired system for administrative and judicial review.  As described below, binding authority divests this Court of jurisdiction to entertain such a request.

### A. THIS COURT LACKS JURISDICTION TO ENTERTAIN ARGUMENTS OF CONSTITUTIONAL ERROR OUTSIDE OF THE SPECIFIC JUDICIAL REVIEW SCHEME THAT CONGRESS PROMULGATED

It is by now axiomatic "that no one is entitled to judicial relief for supposed or threatened injury until the prescribed administrative remedy has been exhausted."  Thetford Properties IV L.P. v. HUD, 907 F.2d 445, 448 (4th Cir. 1990) (noting this to be a "long settled rule of judicial administration"); see also Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938). This rule is no less applicable where a litigant raises issues of a constitutional dimension.  See, e.g., Nationsbank Corp. v. Herman, 174 F.3d 424, 429 (4th Cir. 1999) (recognizing the "consistent and unambiguous line of cases rejecting the contention that constitutional claims should be exempt from the exhaustion requirement").  And although administrative exhaustion is generally a prudential doctrine, see Volvo GM Heavy Truck Corp. v. Dep't of Labor, 118 F.3d 205, 211-12 (4th Cir. 1997), it becomes a jurisdictional mandate where Congress has created an exclusive system for administrative and judicial review within a particular context.

Where Congress has created a streamlined review scheme that channels judicial review into a single Article III forum, constitutional challenges must be presented to that forum at the conclusion of administrative proceedings.  As the Supreme Court has held:

> As for petitioner's constitutional claim, we agree that "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies."  This rule is not mandatory, however . . . [and] the Commission has addressed constitutional questions in previous enforcement proceedings.  *Even if this were not the case*, however, plaintiff's statutory and constitutional claims here can be meaningfully addressed in the court of appeals.
>
> *We conclude that the Mine Act's comprehensive enforcement scheme, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishes a 'fairly discernible' intent to preclude district court review in the*

*present case.* . . . To uphold the District Court's jurisdiction in these circumstances would be inimical to the structure and the purposes of the Mine Act.

Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 215 (1994) (emphasis added) (footnotes and citations omitted) (quoting Johnson v. Robison, 415 U.S. 361, 368 (1974)).  Put simply, allowing a litigant to circumvent Congress's deliberately-crafted review scheme would both defeat the purpose behind the streamlined system and merely "duplicate" the specific judicial review that Congress provided.  See Sturm Ruger & Co. v. Herman, 300 F.3d 867, 876 (D.C. Cir. 2002) ("Our obligation to respect the review process established by Congress bars us from permitting Sturm Ruger to make this end run [around Congress's review scheme], and requires dismissal of its district court complaint."); see also Hirschberg v. CFTC, 2003 WL 22019310, at *4 (N.D. Ill. Aug. 27, 2003) ("Because Hirschberg's constitutional claims also 'can be meaningfully addressed in the court of appeals' . . . this Court's jurisdiction would duplicate the CEA's statutory appeals procedure.").  Put simply, as the Supreme Court has more recently concluded, "the appropriate inquiry" is "whether it [was] fairly discernible" from the statutory scheme that Congress intended litigants "to proceed exclusively through the statutory review process."  Elgin v. Dep't of the Treasury, 132 S. Ct. 2126, 2133 (2012).

Another Eastern District jurist recently applied these principles to preclude this Court's jurisdiction over a request to enjoin the conduct of USPTO administrative proceedings – based on allegations that those proceedings ran afoul of plaintiff's constitutional rights – because the Patent Act established a particular scheme for judicial review.  See Cooper v. Lee, 86 F. Supp. 3d 480 (E.D. Va. 2015).  In Cooper, plaintiffs were patent owners embroiled in *inter partes* review proceedings before the USPTO – proceedings through which the USPTO reconsiders its prior decision to issue a patent.  As here, plaintiffs in Cooper maintained that these *inter partes* review proceedings violated their constitutional rights, and asked this Court to enter an

injunction terminating those proceedings.  See id. at 482.  Much like its treatment of USPTO

disciplinary proceedings, the Patent Act provided a single avenue for judicial review of

administrative *inter partes* review proceedings – *i.e.*, an appeal to the Federal Circuit from the

Patent Trial and Appeal Board's ("PTAB") final written decision.  See 35 U.S.C. § 319.  For this

reason, *inter alia*, Judge Lee concluded that he could not entertain plaintiff's claims about the

constitutionality of the proceedings, and that any constitutional challenge needed to be presented

to the Federal Circuit at the *end* of proceedings pursuant to the congressionally-created scheme

for judicial review.  See Cooper, 86 F. Supp. 3d at 489.

And so it is here.  There can be little doubt that, as the Federal Circuit has already held,

Congress intended that the filing of a petition for review in this Court pursuant to § 32 – *after* the

USPTO Director issues her final administrative decision – would serve as the exclusive

mechanism for Article III review of disciplinary charges against a USPTO practitioner.  It is

well-settled "that a precisely drawn, detailed statute pre-empts more general remedies."  Brown

v. GSA, 425 U.S. 820, 834 (1976).   The Patent Act's establishment of a private right of action

for Article III judicial review for an aggrieved practitioner pursuant to § 32 easily fits this

principle.  The process by which the USPTO may seek to discipline an agency practitioner –

including administrative trial proceedings before an independent hearing officer and

administrative appellate proceedings before the USPTO Director – are, as detailed above, both

comprehensive and specific.  And at the end of these administrative proceedings, should the

USPTO enter a final order of suspension against a practitioner, Congress provided a specific

cause of action for Article III judicial review of that order.  See 35 U.S.C. § 32.  For these

reasons, the Federal Circuit has held that litigants cannot raise challenges – constitutional or

otherwise – to disciplinary proceedings outside of the specific circumstances identified in § 32.

See Franchi v. Manbeck, 972 F.2d 1283, 1288-89 (Fed. Cir. 1992).

But that is exactly what plaintiff asks of this Court – to adjudicate the propriety of a portion of the pending disciplinary charges against him while administrative proceedings related to those charges are ongoing, before either the independent hearing officer or the USPTO Director can render a decision on those disciplinary charges, and outside of the specific avenue for judicial review Congress authorized.  The above authority precludes this Court from exercising jurisdiction over plaintiff's attempt to circumvent Congress's system for administrative and judicial review of disciplinary charges through a collateral Article III proceeding.  And although not dispositive of this issue, plaintiff *has* an opportunity to press his argument that the RFIs in question were unconstitutional during the pending administrative proceedings.[7]  As the relevant USPTO RPC provides, plaintiff can only be disciplined for failing to respond to a "lawful" request for information during investigation, see 37 C.F.R. § 11.801(c); indeed, OED's complaint against plaintiff specifically provides that its requests of plaintiff were "lawful" within the meaning of the rule.  DEX 3.  Plaintiff will thus be able to argue – to the independent hearing officer, the USPTO Director, and ultimately this Court within § 32 judicial review – that OED's RFI's were unconstitutional (or, in the parlance of the rule, "unlawful").

Regardless, however, this Court lacks jurisdiction to consider plaintiff's request for an injunction terminating that portion of the disciplinary proceedings against him outside of the exclusive vehicle for judicial review found in § 32.  Plaintiff's constitutional challenge to any

---

[7]Importantly, individuals are *still* required to traverse a particularized administrative and judicial review scheme even if an administrative agency cannot provide it the constitutional relief requested.  See, e.g., Ticor Title Ins. Co. v. FTC, 814 F.2d 731, 738 (D.C. Cir. 1987) (opinion of Edwards, J.) (holding that general exhaustion rule "has been applied even where the plaintiffs have challenged the very authority of the agency to conduct proceedings against them")

potential discipline based on his purported failure to respond to OED's RFIs in this Court thus must await the conclusion of administrative review, and proceed pursuant to § 32.

### B. THERE HAS BEEN NO "FINAL AGENCY ACTION" OVER WHICH THIS COURT MAY EXERCISE JURISDICTION

Even if this Court, despite the Federal Circuit's decision in <u>Franchi</u>, were to conclude that the administrative and judicial review scheme Congress authorized in § 32 was not the exclusive means by which to review USPTO disciplinary decisions, there still has been no "final agency action" over which this Court can exercise judicial review.  In this respect, at bottom, plaintiff seeks judicial review over an ongoing *administrative* proceeding – a matter generally governed by the provisions of the Administrative Procedure Act ("APA").  But the APA only authorizes judicial review over "final agency action."  5 U.S.C. § 704.

As the Supreme Court has held, the mere filing of an administrative complaint against a litigant is the antithesis of a "final agency action," as it is only the beginning of the administrative process.  <u>FTC v. Standard Oil Co.</u>, 449 U.S. 232, 241-43 (1980).  The rationale behind this strict limitation is clear:  review of a non-final agency decision "interfere[s] with the proper functioning of the agency and [is] a burden for the courts."  <u>Id.</u> at 242.  Allowing district courts to exercise APA jurisdiction over such action "leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary."  <u>Id.</u>  Put simply, as delineated above, plaintiff may present his argument that the RFIs in question were "unlawful," and that the disciplinary charges based on the same should thus not be sustained, during his pending disciplinary proceedings – arguments that either the independent hearing officer or the USPTO Director on administrative appellate review may very well accept, thus obviating any need whatsoever for this Court's Article III review.

## III.   THE RFIS SERVED BY OED'S INVESTIGATORS DID NOT RUN AFOUL OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

Even if this Court possessed the jurisdiction to intervene in plaintiff's pending disciplinary proceedings outside of Congress's scheme for administrative and judicial review, there was nothing constitutionally-infirm about either the OED investigators' RFIs, or the disciplinary charges based on plaintiff's responses to the same.  As stated above, plaintiff will have a full and fair opportunity to argue – during the disciplinary hearing before an independent administrative law judge (and on administrative and judicial review) – that those RFIs were unconstitutional.  But those arguments are meritless, as nothing about OED's RFIs violated plaintiff's Fourth and Fifth Amendment rights.

Nor does this Court consider these constitutional questions on a completely blank slate, as there has been judicial treatment of virtually *identical* arguments of constitutional deprivation to those that plaintiff presents here – Judge Motz's separate decision in Goldstein v. Moatz, 364 F.3d 205 (4th Cir. 2003).  In Goldstein, another USPTO practitioner under investigation by OED for professional responsibility violations presented similar constitutional arguments concerning putatively overbroad and burdensome RFIs.  See id. at 210.  Judge Motz, writing separately,[8] concluded that these allegations "utterly fail[ed] to . . . give rise to any constitutional violation." See id. at 220 (Motz., J., dissenting).  Citing to the Supreme Court's decisions in Hannah v. Larche, 363 U.S. 420 (1960) and SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 742 (1984), Judge

---

[8]To be sure, Judge Motz's separate opinion was technically a dissent.  But it was not a traditional dissent in that she was not disagreeing with any legal analysis offered by the panel majority.  In Goldstein, the District Court dismissed the action based on its conclusion that the defendants were entitled to absolute immunity from suit, and the panel majority reversed that conclusion.  See Goldstein, 364 F.3d at 219.  The panel majority did not entertain the merits of Goldstein's constitutional arguments, electing to remand the matter back to the District Court. See id.  Judge Motz simply believed that the constitutional merits – the very same arguments that plaintiff presses here – were too weak even to merit remand, especially because to do so would "serv[e] only to prolong a plainly meritless case."  Id. at 220 n.1 (Motz, J. dissenting).

Motz noted that the courts "summarily rejected a number of constitutional challenges to similar

[] investigative procedures," and had done so with respect "to attorney discipline and public

corruption investigations" as well.  Id. at 222 (Motz, J., dissenting).  There is no reason for this

Court to depart from Judge Motz's cogent analysis.

A.   THERE IS NO COGNIZABLE PROCEDURAL DUE PROCESS PROTECTION WITH
     RESPECT TO INVESTIGATORY FACT-FINDING

Plaintiff first maintains that the OED investigators' RFIs ran afoul of his Fifth

Amendment rights to procedural due process.  The Fifth Amendment to the United States

Constitution generally provides that an individual may not "be deprived of life, liberty, or

property, without due process of law."  U.S. CONST. amend V.  The procedural requirements of

the Due Process Clause have not been the subject of precise definition, leaving the minimal

constitutional protections afforded by the provision somewhat difficult to ascertain with any

mechanical certainty.  See, e.g., Morrissey v. Brewer, 408 U.S. 471 (1972) ("[D]ue process is

flexible and calls for such procedural protections as the particular situation demands.").

Notwithstanding the vague decisional authority concerning the contours of the right, the

Supreme Court has held that – from a general perspective – due process protections minimally

require "notice and an opportunity to be heard."  Mallette v. Arlington County Employees'

Supplemental Retirement Sys., 91 F.3d 630, 640 (4th Cir. 1996).

But as the Supreme Court has repeatedly held, and Judge Motz correctly observed, the

Fifth Amendment's procedural due process protections do not attach to issues related to agency

fact-finding efforts:

> [W]hen governmental agencies adjudicate or make binding determinations which directly
> affect the legal rights of individuals, it is imperative that those agencies use the
> procedures which have traditionally been associated with the judicial process.  *On the
> other hand*, when governmental action does not partake of an adjudication, as for

example, when *a general fact-finding investigation is being conducted*, it is not necessary that the full panoply of judicial procedures be used.

Hannah v. Larche, 363 U.S. 420, 442 (1960) (emphasis added); see also SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 742 (1984) (holding that Hannah "leaves no doubt that [] the Due Process Clause of the Fifth Amendment" is not "offended when a federal administrative agency . . . uses its subpoena power to gather evidence").  The same dichotomy applies here.  Although plaintiff seeks injunctive relief with respect to the OED Director's prosecution of him on charges of unethical conduct, his constitutional arguments are focused on RFIs that were issued to him during by the OED investigators during the investigatory process.  "The Due Process Clause is not implicated under such circumstances because an administrative investigation adjudicates no legal rights."  O'Brien, 467 U.S. at 742.  And now that the OED Director has commenced disciplinary proceedings – during which plaintiff's "legal rights" will most certainly be "adjudicated" – plaintiff will receive far more than constitutionally-minimal due process.

Before leaving the Fifth Amendment, it bears mentioning that what ostensibly serves as the gravamen of plaintiff's due process claim – *i.e.*, that there is a "complete absence" of any mechanism to challenge troublesome RFIs – is wildly inaccurate.  As stated above, in the wake of the Fourth Circuit's Goldstein criticism in this regard, the USPTO created a specific administrative and judicial review scheme for any action taken by OED personnel during an investigation.  See 37 C.F.R. § 11.2(e).  Not only is a dissatisfied practitioner afforded *two* levels of administrative review, but any final agency action issued by the USPTO Director on this score may be appealed to this Court under the APA.  Even were due process strictures to attach to OED investigations – and they do not – the USPTO's tailor-made process more than adequately discharge any constitutional obligation.

**B.      PLAINTIFF DOES NOT ENJOY FOURTH AMENDMENT PROTECTION WITH RESPECT TO RFIS**

1.      Plaintiff also maintains that the RFIs "amount[] to an unreasonable search within the meaning of the Fourth Amendment." Complaint, ¶70.  It is difficult to comprehend the nature of plaintiff's claim in this regard, because OED did not attempt to affect anything approaching the type of "search" that typically animates Fourth Amendment analysis.  Based on the briefing in Goldstein, however, it appears that plaintiff is attempting to equate the Fourth Amendment jurisprudence applicable to administrative *subpoenas* to the RFIs at issue here.  See, e.g., United States v. Morton Salt Co., 338 U.S. 632, 642-43 (1950).  To the best of undersigned counsel's knowledge, there is no decisional authority in this jurisdiction applying this strain of Fourth Amendment authority to simple requests for information to licensed attorneys during an bar investigation.  This lack of authority is sufficient itself to reject plaintiff's claim.

Nor should this Court extend Fourth Amendment jurisprudence to encompass RFIs issued during a fact-finding investigation into putative attorney misconduct.  Unlike *subpoenas* – which are enforceable through the contempt power of the judiciary – OED RFIs are not enforceable through any particular mechanism; indeed, failure to comply with a RFI is only potentially grounds for an independent disciplinary charge, which itself is ultimately adjudicated through the administrative and judicial review process.[9]  Cf. In re Bailey, 182 F.3d 860, 862 (Fed. Cir. 1999) (rejecting constitutional arguments against "dilatory and abusive tactics" of a

---

[9]Indeed, the Oklahoma Supreme Court has differentiated between requests for information to an attorney during a disciplinary investigation and a third-party subpoena during that same investigation.  See Oklahoma *ex rel.* Oklahoma Bar Ass'n v. Gasaway, 863 P.2d 1189, 1198-1200 (Okla. 1993).  During a bar investigation, the Oklahoma Bar Association "asked" the relevant attorney "to provide information and documents," but the attorney twice "declined to respond." Id. at 1198.  In response, the Bar Association transmitted a *subpoena* to a third-party bank for similar documentation, and – noting that the court was "amply empowered to enforce a subpoena issued in the course of Bar disciplinary proceeding" – ultimately applied Fourth Amendment doctrine to the subpoena.  Id. at 1199-1200.

bar association during attorney investigation "because the court, not the Committee" ultimately

makes "the determination whether [the attorney] will be subject to discipline").

2.      But in any event, even were the Fourth Amendment law applicable to administrative

subpoenas applicable to OED's RFIs, there can be little doubt that these RFIs would pass

constitutional muster.  As the Supreme Court has held, to be consistent with the Fourth

Amendment, an administrative subpoena is sufficient "if the inquiry is within the authority of the

agency, the demand is not too indefinite, and the information sought is reasonably relevant."

Morton Salt, 338 U.S. at 652-53.  Importantly, this standard is extremely fluid, allows an agency

much leeway, and thus "cannot be reduced to formula" because "relevancy and adequacy or

excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and

scope of the inquiry."  Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209 (1946).

In this respect, plaintiff primarily complains about the breadth of OED's RFIs,

maintaining that because those requests asked him for information about his representational

efforts over a large period of time (and thus concerned a large number of trademark applications

with which he was allegedly involved), they were overly burdensome.  But the Fourth Circuit

has rejected this argument under very analogous circumstances in the context of a subpoena that

would have required a physician "to produce more than 15,000 patient files alone, consisting of

between 750,000 and 1.25 million pages of material" that would obviously been sensitive in

nature.  In re Subpoena Duces Tecum, 228 F.3d 341, 345 (4th Cir. 2000).  As the panel provided:

> [I]f Bailey had treated 15,000 patients over a period of seven years and all of them were
> reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a
> review of Bailey's documentation of services to these patients, of the claims submitted on
> their behalf, and of the reimbursements collected.  Even though these documents might
> be numerous, they would reasonably relate to and further the government's legitimate
> inquiry, which might be defined by any of 13 federal statutory offenses, including fraud.

Id. at 350.[10]  Here, at their allegedly most burdensome, the RFIs that OED tendered to plaintiff did not seek the production of anything approaching this level of documentation; rather, akin to an interrogatory, they asked plaintiff *a question* about his practice.  Complaint, ex.B.   Because OED was not required "to ascertain . . . the extent of any wrongdoing" on plaintiff's part "before issuing" its RFIs, id. at 351, it was certainly not constitutionally-required to limit its RFIs before learning of the scope of plaintiff's putative misconduct.

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss plaintiff's complaint against the USPTO.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:     _____/s/_____
DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:        (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

DATE: March 22, 2016            ATTORNEYS FOR DEFENDANTS

OF COUNSEL:        Tracy Kepler
United States Patent and Trademark Office

---

[10]For this reason, plaintiff's reflexive invocation of the attorney-client relationship does not change the constitutional calculus.  Indeed, even § 11.801(b) itself provides that a practitioner cannot be sanctioned merely for refusing to provide information that the rules otherwise deem confidential, see 37 C.F.R. § 11.106, as a result of the attorney-client relationship.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a true and correct copy of the same to the following:

Danny M. Howell
Sands Anderson, P.C.
1497 Chain Bridge Road, Suite 202
McLean, Virginia  22101
<u>Email</u>: <u>dhowell@sandsanderson.com</u>

Date: March 22, 2016                      _____/s/_____
DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:          (703) 299-3983
Email:  <u>dennis.barghaan@usdoj.gov</u>

ATTORNEYS FOR DEFENDANTS