## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |
|---|---|
| MATTHEW H. SWYERS,                )<br><br>*Plaintiff*,                )<br><br>v.                )<br><br>UNITED STATES PATENT AND<br>TRADEMARK OFFICE, et al.,                )<br><br>*Defendants*.                ) | Civil No. 1:16-cv-15<br><br>Hon. Liam O'Grady |

### Memorandum Opinion

Matthew Swyers filed this action to enjoin the United States Patent and Trademark Office ("PTO") from pursuing disciplinary proceedings against him stemming from the Office of Enrollment and Discipline's ("OED") purportedly unconstitutional investigation into his patent practice. In addition to injunctive relief, Swyers seeks damages from three individual PTO employees pursuant to *Bivens*.[1] During the pendency of the complaint, the PTO initiated a formal disciplinary proceeding against Swyers that is now pending before an administrative law judge.

The PTO moves to dismiss the complaint on the ground that the statutory scheme put in place by Congress precludes judicial review of Swyers' claims at this stage or, alternatively, for failure to state a claim. (Dkt. No. 14). The individual defendants have separately moved to dismiss for failure to state a *Bivens* cause of action or, alternatively, on the basis of qualified immunity. (Dkt. No. 17). The motions are fully briefed, and the Court heard argument on May

---

[1] *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

6, 2016. For substantially the same reasons identified in the defendants' briefing, the Court will grant the motions and dismiss the complaint.

## I. BACKGROUND

This section first sets out the relevant statutory and regulatory framework and then turns to the facts as alleged in the complaint.

### A.    PTO Disciplinary Investigations and Proceedings

Congress vested the PTO with "broad authority to govern the conduct of proceedings before it and to govern the recognition and conduct of attorneys." *Lacavera v. Dudas*, 441 F.3d 1380, 1383 (Fed. Cir. 2006); *see also Kroll v. Finnerty*, 242 F.3d 1359, 1364 (Fed. Cir. 2001); *Halvonik v. Dudas* , 398 F. Supp. 2d 115, 121 n.12 (D.D.C. 2005) (describing the power as "plenary"). Among other things, 35 U.S.C. § 2 provides that the PTO may establish regulations "govern[ing] the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Office, and may require them, before being recognized as representatives of applicants or other persons, to show that they are of good moral character and reputation and are possessed of the necessary qualifications to render to applicants or other persons valuable service, advice, and assistance in the presentation or prosecution of their applications or other business before the Office." *Id.* § 2(b)(2)(D).  Section 32, titled "Suspension or Exclusion from Practice," provides that "[t]he Director may, after notice and opportunity for a hearing, suspend or exclude, either generally or in any particular case, from further practice before the [PTO], any person, agent, or attorney shown to be incompetent or disreputable, or guilty of gross misconduct, or who does not comply with the regulations established under section 2(b)(2)(D)." *Id.* § 32.  A grieving practitioner may seek review in this Court.

2

Pursuant to this authority, the PTO promulgated rules of professional conduct and subjects attorneys to discipline for failure to comply. *See* 37 C.F.R. §§ 10.20–112 (Code of Professional Responsibility); *id.* §§ 11.101–901 (Rules of Professional Conduct). The PTO's disciplinary process proceeds in two phases: the investigation of possible grounds for discipline and the institution of formal disciplinary proceedings. *See id.* §§ 11.2, 11.19–11.60. Disciplinary investigations are the province of the Office of Enrollment and Discipline and its Director. *Id.* §§ 11.2(b)(3), 11.22(a). "An investigation may be initiated when the OED Director receives a grievance, information or evidence from any source suggesting possible grounds for discipline." *Id.* § 11.22(a). When an investigation is initiated, the Director must provide the practitioner written notice. *Id.* § 11.22(e).

The OED conducts investigations by issuing requests for information and evidence (a "RFI") to either "(i) [t]he grievant, (ii) [t]he practitioner, or (iii) [a]ny person who may reasonably be expected to provide information and evidence needed in connection with the grievance or investigation." *Id.* § 11.22(f)(1). The Director may also "request information and evidence . . . from a non-grieving client" if one of two conditions is met. Either the practitioner consents to the contact or a member of the Committee on Discipline—an independent panel[2]— finds "that good cause exists to believe that the possible ground for discipline alleged has occurred with respect to non-grieving clients." *Id.* § 11.22(f)(2).

PTO rules require practitioners to respond to "lawful demand[s] or request[s] for information from an admissions or disciplinary authority," except to the extent that doing so

---

[2] The Committee on Discipline consists of three PTO employees, none of whom report directly or indirectly to the OED Director or any employee designated to decide disciplinary matters. 37 C.F.R. § 11.23(a).

would "require disclosure of information otherwise protected by [privilege]." *Id.* § 11.801(b). A

practitioner who "knowingly fail[s] to respond" may be subject to discipline. *Id.*

PTO regulations contain a mechanism by which any "dissatisfied" party may challenge

"any action or notice of any employee of the [OED] during or at the conclusion of a disciplinary

investigation." *Id.* § 11.2(e). In full, that section provides:

> (e) Petition to USPTO Director in disciplinary matters. A party dissatisfied with
> any action or notice of any employee of the Office of Enrollment and Discipline
> during or at the conclusion of a disciplinary investigation shall seek review of the
> action or notice upon petition to the OED Director. A petition from any action or
> notice of the staff reporting to the OED Director shall be taken to the OED
> Director. A party dissatisfied with the OED Director's final decision shall seek
> review of the final decision upon petition to the USPTO Director to invoke the
> supervisory authority of the USPTO Director in appropriate circumstances in
> disciplinary matters. Any petition under this paragraph must contain a statement
> of the facts involved and the point or points to be reviewed and the action
> requested. Briefs or memoranda, if any, in support of the petition must
> accompany the petition. Where facts are to be proven, the proof in the form of
> affidavits or declarations (and exhibits, if any) must accompany the petition. The
> OED Director may be directed by the USPTO Director to file a reply to the
> petition to the USPTO Director, supplying a copy to the petitioner. An oral
> hearing on petition taken to the USPTO Director will not be granted except when
> considered necessary by the USPTO Director. The filing of a petition under this
> paragraph will not stay an investigation, disciplinary proceeding, or other
> proceedings. Any petition under this part not filed within thirty days of the
> mailing date of the action or notice from which relief is requested may be
> dismissed as untimely. Any request for reconsideration of the decision of the
> OED Director or the USPTO Director may be dismissed as untimely if not filed
> within thirty days after the date of said decision. Only a decision of the USPTO
> Director regarding denial of a petition constitutes a final decision for the purpose
> of judicial review.

*Id.*

The PTO's regulations governing disciplinary investigations were not always so

extensive. In 2004, the lack of procedural safeguards within PTO investigations resulted in a

rebuke by the Fourth Circuit. *See Goldstein v. Moatz*, 364 F.3d 204 (4th Cir. 2004). In

*Goldstein*, a practitioner sued several PTO employees for damages and declaratory relief arising

out of "the violation of his constitutional rights to free speech and due process through issuance

4

of the RFIs." *Id.* at 210. In denying the individual defendants absolute immunity, the court

reasoned that "[t]he importance of denying absolute immunity . . . is underscored by the utter

lack of procedural safeguards protecting Goldstein's rights and his clients' secrets." *Id.* at 217.

At that time, the regulations contained no mechanism through which a practitioner could

challenge an RFI, absent the PTO formally initiating disciplinary proceedings. Thus, the Fourth

Circuit noted that Goldstein "had no option but to answer the RFIs because failure to comply

would itself constitute a violation of the disciplinary rules." *Id.*

In the wake of *Goldstein*, the PTO made some changes.[3]  The section of the Code

addressing investigations now explicitly provides authorization to the OED Director to issue

RFIs. *See* 37 C.F.R. § 11.22(f). Before that, the authorization was contained somewhat

ambiguously elsewhere. *See Goldstein*, 364 F.3d at 217–18. Section 11.2(e) was added, giving

all parties the ability to petition for relief from an RFI through administrative channels and

ultimately to an Article III court. Thus, a practitioner "can [now] challenge the RFIs as unduly

burdensome or as protected by attorney-client privilege or attorney work-product privilege," as

the *Goldstein* court envisioned. *Id.* at 218. Finally, as noted above, a practitioner can only be

subject to discipline for failing to response to "a *lawful* demand or request for information" and

discipline cannot stem from refusal to disclose information otherwise protected by privilege. 37

C.F.R. § 11.801(b) (emphasis added).

If the OED Director believes an investigation has uncovered grounds for discipline, he

may institute disciplinary proceedings only if the Committee on Discipline makes a finding of

probable cause. *Id.* §§ 11.22(b), 11.32. If probable cause is found, the OED Director may file a

complaint. *Id.* § 11.32. The practitioner, who may be represented by counsel, then has thirty

---

[3]  In its motion, the PTO concedes that "[p]rior to 2004, there existed scant formal legal
guidance concerning OED's investigations into alleged misconduct." PTO Mtn. at 4.

days to file an answer. *Id.* §§ 11.36, 11.40. From that point, the proceedings bear many of the same hallmarks as traditional litigation. *See id.* § 11.43 (Motions); § 11.44 (Hearings); § 11.45 (Amendment of Pleadings); § 11.50 (Evidence); § 11.51 (Depositions); § 11.52 (Discovery). An independent hearing officer presides over the proceedings, *id.* § 11.39, and the OED Director must prove violations by clear and convincing evidence. *Id.* § 11.49.

Within nine months, the hearing officer must issue an initial decision with findings of fact, conclusions of law, and if a violation is found, an appropriate sanction. *Id.* §§ 11.39(d), 11.54(a). A practitioner may appeal an adverse ruling to the PTO Director. *Id.* § 11.55. The Director may conduct a *de novo* review and either affirm, reverse, or modify the initial decision, or, alternatively, remand for further proceedings. *Id.* § 11.56(a). Both the practitioner and the OED Director have an opportunity to move the PTO Director for reconsideration. *Id.* § 11.56(c). Review of the PTO Director's final decision "may be had . . . by a petition filed in accordance with 35 U.S.C. 32." *Id.* § 11.57.

Section 32 provides that "[t]he United States District Court for the Eastern District of Virginia, under such conditions and upon such proceedings as it by its rules determines, may review the action of the Director upon the petition of the person so refused recognition or so suspended or excluded." 35 U.S.C. § 32. In turn, this Court has promulgated a local rule addressing its jurisdiction over these petitions:

> A person refused recognition to practice or suspended or excluded from practice before the United States Patent and Trademark Office ("USPTO") may seek judicial review of such action by filing in the Alexandria Division of this Court a petition against the Under Secretary of Commerce of Intellectual Property and Director of the USPTO ("Director") within 30 days after the date of the order recording the Director's action. Service of the petition shall be effected in accordance with Fed. R. Civ. P. 4(i)(2). Within 60 days after service of the summons and petition on the U.S. Attorney, the Director shall respond to the petition and file a certified copy of the record and proceedings before the USPTO, which shall constitute the sole basis for the Court's review. The Court may, in its

6

discretion, require briefing and argument prior to making a decision on the petition.

E.D. Va. Local Rule 83.5.

## B.   Allegations in the Complaint[4]

Matthew Swyers is a practicing patent attorney and founder of The Trademark Company, PLLC, "a Virginia law firm whose practice is dedicated exclusively to the representation of clients in the protection of their federal trademark and copyright rights." Compl. ¶ 13. The Trademark Company aims to "provide[] access to thousands of persons who would not normally be able to afford to protect their intellectual[] property under standard law firm pricing structures." *Id.* ¶ 14. On an annual basis, the firm "handles thousands" of matters. *Id.* ¶ 15. From the time of its founding in 2003 to date, The Trademark Company has represented more than 20,000 clients. *Id.* ¶ 16. As of 2015, the Company had employed Swyers and fourteen other employees, none of whom were attorneys. *Id.* ¶ 49.

In 2014, the OED initiated an investigation into Swyers' practice before the PTO.[5] *Id.* ¶ 18. Over the course of a year, the OED sent Swyers five RFIs, in what Swyers believes was "an unwarranted, oppressive, and unconstitutional investigation . . . impacting his ability to practice law, robbing him of thousands of hours of professional time in attempts to respond to the OED requests for information, and costing hundreds of thousands of dollars in legal fees."

---

[4]  Swyers appended many, but not all, of the documents incorporated by reference in the complaint. Defendants attached several of these documents to their motions to dismiss. "[A] court may consider documents attached to the complaint or the motion to dismiss so long as they are integral to the complaint and authentic." *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012) (internal quotation marks omitted).

[5]  Swyers has no knowledge of any client complaints lodged against him. *Id.* ¶¶ 17, 18, 35. He believes the OED is targeting him because of the burden placed on the PTO by the sheer volume of The Trademark Company's filings. *Id.* ¶ 17.

*Id.* ¶ 36. Because the gravamen of Swyers' complaint is the OED's method of investigation, it is necessary to go into some detail.

Swyers received the first RFI in August 2014 from defendant Leonardo Villarreal Alejandro, an OED staff attorney. *Id.* ¶¶ 19, 37; Defs.' Ex. 1. It contained eight inquiries directed at three trademark applications filed by Swyers. Compl. ¶ 37; Defs.' Ex. 1 at 2. The letter also identified six PTO rules "under possible consideration in th[e] investigation," and further warned that

> It is a violation of the USPTO Rules of Professional Conduct to fail to cooperate with OED in an investigation of any matter before it, or to knowingly fail to respond to a request from OED. *See* 37 C.F.R. § 11.801(b). In addition, if you do not respond to this request for information, the Committee on Discipline may draw an adverse inference in making a determination under 37 C.F.R. § 11.23.

Compl. ¶ 19; Defs. Ex. 1 at 3. The letter requested a response within thirty days.

Swyers provided the requested information in October. Compl. ¶¶ 21, 37. "Almost immediately, the OED's investigation broadened into an inquiry into virtually every trademark matter ever handled by Swyers." *Id.* ¶ 22. OED staff attorneys began contacting Swyers' clients by letter and telephone regarding their trademark applications.[6] *Id.* ¶ 23. In December 2014, Mr. Villarreal Alejandro sent a letter to Swyers' clients without his knowledge or consent that requested "assistance in connection with a review of [their] trademark application." *Id.* The letters asked for a written response regarding whether the client had actually provided marks to The Trademark Company. *Id.* ¶¶ 25, 27. The letters did not state that the OED was investigating

---

[6] In its motion, the PTO explains that it followed the process mandated in 37 C.F.R. § 11.22(f)(2) and received permission to contact non-grieving clients from the Committee on Discipline. Despite this explanation, Swyers' opposition states: "Notably, Defendants *never* allege in their Motion to Dismiss that they received Mr. Swyers' consent or received approval from the Committee on Discipline that good cause existed to contact Mr. Swyers' clients." PTO Opp'n at 4 n.2 (emphasis in original).

Swyers or that the purpose of the letter was to gather evidence for that investigation. *Id.* ¶ 24. They also did not advise the clients of their rights with regard to answering the RFI, suggest that they contact a lawyer before answering, or mention attorney-client privilege. *Id.* ¶¶ 25–26.

On at least one occasion, OED staff called one of Swyers' clients and inquired about a trademark application. *Id.* ¶ 28. Upon information and belief, OED staff "assured the client that they did not need to worry because the caller was not an attorney, and expressly advised the client that they need not speak with Swyers before answering questions, again without advising the client regarding the existence of the attorney-client relationship or about the potential waiver of such privilege." *Id.*

Clients began contacting Swyers and informing him of the OED contacts. On December 16, 2014, Swyers, by counsel, "spoke to the individual defendants" and asked that they stop contacting clients and also provide a complete list of clients contacted. *Id.* ¶ 29. Although defendant Ronald Jaiks said a list would be provided, it never was. *Id.*

On December 19, Mr. Villareal Alejandro issued a second RFI. *Id.* ¶ 38; Pl.'s Ex. A. The RFI explained that part of the OED's inquiry "concerns . . . compliance with USPTO electronic signature rules." Pl.'s Ex. A at 14. The RFI identified approximately 500 trademark applications, *see id.* at 2–14, and requested that for each submission filed in each of the 500 applications Swyers identify whether he personally entered his signature or whether he had another person do so; identify each submission filed electronically for which he did not personally enter the signature; explain for each document that was not personally signed why he did not do so; and identify all other submissions filed electronically with the PTO for which Swyers did not personally enter his signature. *Id.* at 14–15. Swyers contends that the last request required him to review each of the 16,000 applications he had filed with the PTO.

Compl. ¶ 40.  The letter identified eight PTO rules under consideration and requested response by January 9, 2015.  Pl.'s Ex. A at 16.

Swyers provided a response on March 16, 2015.  *Id.* ¶ 42.  Shortly thereafter, on March 20, the OED requested a settlement conference at its offices in Alexandria.  *Id.* ¶ 43.  Swyers "spent a significant time preparing for the conference and expended costs for travel [from Boston]," only to have the OED cancel the day before citing an insufficient evidentiary record.  *Id.*

On March 30, defendant Gerard Taylor issued a third RFI and requested a response in fifteen days.  *Id.* ¶ 44; Defs.' Ex. 2.  It contained two requests.  The first asked for clarity regarding Swyers' earlier responses.[7]  Specifically, it asked if Swyers' position was that "The Trademark Company PLLC's business records do not indicate who electronically signed his name to the trademark applications listed in OED's Second RFI, and . . . Mr. Swyers does not recall or know who electronically signed his name to the trademark applications listed in OED's Second RFI."  Defs.' Ex. 2 at 1.  The second request directed Swyers to provide "the full names, mailing addresses and personal telephone numbers for all of the current and former employees of The Trademark Company," including "non-paid interns, clerks, and volunteers."  *Id.*  The letter also "request[ed] Mr. Swyers' permission to speak with the Trademark Company's current employees in person, during . . . normal hours of business."  *Id.* at 2.  Finally, the letter identified twelve rules under consideration.

On April 15, Swyers responded that he personally and individually signed many, but not all, trademark applications filed with the PTO; that "some entering of my name on other e-

---

[7] None of Mr. Swyers' responses were attached to the complaint or Defendants' motions to dismiss.  However, it is possible to glean some of their content from the RFIs.

signatures was done by the well-trained and well-experienced Research and Applications

Specialists (of an unknown number of times by the unknown names of the Research and

Applications Specialists who entered those e-signatures)"; and that electronic signings were

"done by me and the Research and Application Specialists as a group or collective effort." Pl.'s

Ex. D at 2.  He also provided the name of one employee, but withheld the rest of the requested

employee information on the grounds that the request was "overly broad, unduly burdensome,

and not reasonably calculated to lead to the discovery of admissible, probative, non-redundant,

and relevant evidence or information"; that the RFI failed to provide adequate instructions and

definitions; that the request implicated "attorney-client privilege, deliberative process privilege,

attorney work product doctrine, [and] any other applicable privilege"; that the request was

"oppressive or unnecessarily expensive"; that the request "do[es] or may impact, the privacy of

TMC personnel in general or under Federal, or State law in particular"; and that the request

"do[es] or may impact, the legal rights of TMC personnel under Federal or State law." Pl.'s Ex.

B at 2–3.

　　　The OED responded with a letter providing notice that Swyers' response to the Third RFI

was incomplete.  The letter also comprehensively responded to each of Swyers' objections and

warned that his failure to comply "raise[d] ethical considerations under 37 C.F.R. § 11.801(b)."

*Id.* at 1.  The letter concluded by requesting full compliance with the RFI and that Swyers

"provide specific factual and legal support for any objections raised, as well as any other

information he believes will be helpful to the OED Director in examining the issues raised in this

letter." *Id.* at 4.  On April 27, Swyers supplemented his response with all of the employee

information OED had requested.  Compl. ¶ 47.  Swyers also requested to reschedule the

settlement conference, but the OED declined. *Id.* ¶ 48.

On May 7, Mr. Taylor sent RFIs to fourteen employees of The Trademark Company pursuant to 37 C.F.R. § 11.22(f)(1)(iii). *Id.* ¶ 49; Pl.'s Ex. C. The letter explained that the OED "is investigating certain trademark applications and trademark documents filed by and through The Trademark Company." Pl.'s Ex. C at 1. Each RFI contained 64 requests, ranging from basic information to inquiries like, "Have you ever prepared a trademark application that was filed by The Trademark Company with the [PTO]? If so, do you believe that you are able to identify the clients and/or the trademark application serial numbers in which you prepared a trademark application between January 1, 2010, and January 28, 2015?" *Id.* at 2–15.

On May 18, Mr. Taylor sent Swyers a fourth RFI. Compl. ¶ 50; Pl.'s Ex. D. It stated: "In light of information gathered to date . . . [OED] has additional questions regarding the manner in which over fifteen thousand (15,000) trademark applications and related trademark application submissions were filed in the [PTO] . . . since January 1, 2010." Pl.'s Ex. D at 1. The RFI contained 149 inquiries divided between ten issues:

1. Possible professional misconduct in connection with Mr. Swyers possibly knowingly allowing others to sign of trademark application and trademark application submissions filed in the Office under Mr. Swyers' name;

2. Possible professional misconduct in connection with Mr. Swyers possibly knowingly allowing others to sign his name to declarations filed in the Office;

3. Possible professional misconduct in connection with the submission of possible phony specimens to the Office by Mr. Swyers and/or by non-practitioners under Mr. Swyers' supervision;

4. Possible professional misconduct in connection with possible lack of safekeeping client property;

5. Possible professional misconduct in connection with possible lack of safeguarding client property and possible false or misleading statements;

6. Possible professional misconduct in connection with possible sharing of legal fees with non-practitioners;

7.  Possible professional misconduct in connection with possible impermissible limiting of liability;

8.  Possible professional misconduct in connection with possible false certifications to the Office and possibly knowingly filing papers in the Office without ensuring the accuracy of the papers;

9.  Possible professional misconduct in connection with failing to take corrective action on behalf of a trademark applicant after learning that a phony specimen was filed with the Office and after representing to OED that corrective action was being taken; and

10. Possible professional misconduct in connection with Mr. Swyers possibly interfering with OED investigation.

*Id.* at 1–35.

Because some of the requests pertained to correspondence relating to certain trademark

applications, the letter contained a privilege instruction:

> If information or documents are withheld on the basis of privilege, please (a) provide a copy of the document with only the purported privileged components of the document redacted, (b) state the privilege(s) being asserted, and (c) state the factual and legal basis for the privilege(s). If the entire document is withheld on the basis of privilege, please provide a privilege log that states the document type, the date of the document, the author of the document, the privilege(s) being asserted, and the factual and legal basis for the assertion of the privilege(s).

*Id.* at 35.  A response was requested within thirty days. *Id.* at 36.

On June 18, Swyers provided a timely 113-page response. Compl. ¶ 52. The OED sent a

letter providing notice that Swyers had not provided complete responses to 37 questions. *Id.*

¶ 53. The letter also stated Swyers had violated 37 C.F.R. § 11.801(b) and was subject to

discipline pursuant to 37 C.F.R. § 11.32. *Id.*

On June 29, Mr. Taylor sent a fifth RFI asking for the production of certain specific

documents relating to a subset of trademark applications. *Id.* ¶ 54; Pl.'s Ex. E at 2–3. This letter

also contained a privilege instruction. *Id.* at 7. The letter instructed that after receiving complete

13

responses from the RFIs sent to the employees and Swyers' response to the final RFI, "the OED Director may reschedule the previously postponed . . . settlement conference." *Id.* at 7–8.

On November 6, Swyers provided a supplemental response to the fourth RFI and a response to the fifth RFI. Compl. ¶ 55. The OED provided notice that both responses were incomplete. *Id.* Swyers describes the OED's objections to his responses as "simply repeat[ing] the so-called deficiencies of the original" response; based on "minutiae"; or "label[ing] clear, simple responses as 'ambiguous.'" *Id.* ¶ 56.

At the time Swyers filed suit against the PTO, he had incurred over $250,000 in legal fees. *Id.* ¶¶ 60, 65. He had also spent hundreds of hours away from his own practice, time which he values at approximately $300,000. *Id.*

## B.    Procedural History

### 1.    The Federal Lawsuit

In January 2016, Swyers sued the PTO and three individual PTO officials—Ronald Jaiks, OED's acting General Counsel; Gerard Taylor, OED counsel; and Leonardo Villarreal Alejandro, OED counsel (collectively, the "Individual Defendants").[8] The complaint alleges two constitutional violations. Count One asserts that "the USPTO, through the individual actions of Taylor, Jaiks, and Villarreal Alejandro violated and continue to violate Swyers' rights to procedural due process of law safeguarded by the Fifth Amendment of the Constitution relative to the inquiry into and actions regarding his professional work as a trademark lawyer." *Id.* ¶ 67. Count Two asserts that "[t]he OED's and the individual defendants' promulgation of its RFIs to Swyers . . . amounts to an unreasonable search within the meaning of the Fourth Amendment" and "[t]he accompanying intrusion upon the attorney-client privilege invades Swyer's [sic] right

---

[8] The complaint also lists a "Jane Doe" official as a defendant.

14

to privacy under the Fourth Amendment." *Id.* ¶ 70.  As relief, Swyers seeks preliminary and permanent injunctive relief against the PTO and damages from the Individual Defendants. *Id.* ¶¶ 65, 77, 72–75.

> 2.    The Initiation of a Disciplinary Proceeding

At the time Swyers filed his complaint, the OED's investigation was still pending.  On March 11, 2016, the OED Director filed a complaint against Swyers, thereby initiating a disciplinary proceeding.  The complaint alleges eight counts, one of which is based on Swyers' failure to respond to the RFIs. *See* Defs.' Ex. 3.  As relief, the complaint seeks the entry of an order "excluding or suspending [Swyers] from practice before the USPTO in patent, trademark, and other non-patent matters." *Id.* at 53.  The matter is currently pending before an administrative law judge ("ALJ") in the U.S. Environmental Protection Agency.  During the May 6 hearing, the PTO represented that Swyers has filed an answer in the administrative proceeding raising the same constitutional claims as are at issue here.

## II. DISCUSSION

Because the PTO and the Individual Defendants have filed separate motions, the Court addresses each in turn applying the well-established motion to dismiss standard.

## A.    The PTO's Motion to Dismiss

The PTO contends the Court is presently without jurisdiction to reach Swyers' claims because Congress, through 15 U.S.C. § 32, intended to channel all Article III review of PTO disciplinary proceedings to a single court (this court, in fact) and only *after* the conclusion of the administrative proceedings.  The Court agrees.  Swyers' federal lawsuit is an impermissible attempt to bypass the channels prescribed by Congress.  His day in court will come, but not yet.

The PTO submits that the Supreme Court's decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) and its progeny provide the relevant framework. There, the Court stated that "[p]rovisions for agency review do not restrict judicial review unless [1] the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction, and [2] the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3150 (2010) (quoting *Thunder Basin*, 510 U.S. at 207). The first part of the analysis—"whether it is 'fairly discernible' that Congress precluded district court jurisdiction"—is determined by examining the statute's "text, structure, and purpose." *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2133 (2012) (citing *Thunder Basin*, 510 U.S. at 207); *see also Nat'l Taxpayers Union v. U.S. Social Sec. Admin.*, 376 F.3d 239, 241 (4th Cir. 2004). The second piece of the analysis considers whether "a strong countervailing rationale" is present that would reverse the presumption of initial administrative review. *Jarkesy v. S.E.C.*, 803 F.3d 9, 17 (D.C. Cir. 2015) (quoting *E. Bridge, LLC v. Chao*, 320 F.3d 84, 89 (1st Cir. 2003)). The Supreme Court has identified three such indicators: (1) "if a finding of preclusion could foreclose all meaningful judicial review"; (2) "if the suit is wholly collateral to a statute's review provisions"; and (3) "if the claims are outside the agency's expertise." *Free Enter.*, 561 U.S. at 489–90 (quoting *Thunder Basin*, 510 U.S. at 212–13) (internal quotations omitted).

Swyers seeks to enjoin a PTO disciplinary proceeding, an area Congress expressly considered in § 32. While § 32 is "facially silent" as to whether the exercise of jurisdiction otherwise conferred by statutes like § 1331 is precluded at this stage, *see Thunder Basin*, 510 U.S. at 208, the PTO submits it does so implicitly. The Court agrees. As explained above, Congress gave the PTO extensive authority to govern the proceedings and the practitioners

appearing before it. *See* 35 U.S.C. § 2(b)(2)(D). Congress also provided that "[t]he Director may, after notice and opportunity for a hearing, suspend or exclude, either generally or in any particular case, from further practice before the [PTO], any person, agent, or attorney shown to be incompetent or disreputable, or guilty of gross misconduct, or who does not comply with the regulations established under section 2(b)(2)(D)." *Id.* § 32. PTO regulations provide for a hearing before an independent hearing officer and administrative appeal to the PTO Director. Then, by statute, a "person so refused recognition or so suspended or excluded" may seek "review of the action of the Director" by petition to the United States District Court for the Eastern District of Virginia. *Id.*

The structure bears many parallels to the scheme considered in *Thunder Basin*—adjudication of charges by an independent ALJ where a practitioner has the opportunity to present evidence and argument; an opportunity to appeal the decision within the agency; and an appeal of the Director's decision to a single federal court. Although § 32 does not explicitly say that the Eastern District of Virginia's jurisdiction is exclusive, "[i]t is well settled that even where Congress has not expressly stated that statutory jurisdiction is exclusive . . . a statute which vests jurisdiction in a particular court cuts off jurisdiction in other courts in all cases covered by that statute." *Telecommunications Res. & Action Ctr. v. Fed. Commc'ns Comm'n*, 750 F.2d 70, 77 (D.C. Cir. 1984). The Federal Circuit has considered § 32's language and held that the district court identified is "the *exclusive* forum for review of action taken by the Commissioner." *Franchi v. Manbeck*, 972 F.2d 1283, 1288 (Fed. Cir. 1992); *see also Halvonik v. Kappos*, 759 F. Supp. 2d 31, 35 (D.D.C. 2011) ("The District Court for the District of Columbia serves as the exclusive forum for individuals petitioning for review of a decision

17

suspending or excluding them from practice before the USPTO.").[9]  Moreover, § 32 is in contrast to § 1338 which grants jurisdiction "of any civil action arising under any Act of Congress relating to patents" to all district courts. *See Franchi v. Manbeck*, 947 F.2d 631, 633 (2d Cir. 1991). In sum, the Court finds it is fairly discernible from § 32 that Congress intended to preclude district court jurisdiction over pre-enforcement challenges to, or collateral attacks on, PTO disciplinary proceedings.[10]

The Court must also consider whether Swyers' claims are "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 207. Swyers bases his Fifth Amendment due process claim on the purported "utter lack of procedural safeguards" in PTO investigations. Compl. ¶ 61. He states repeatedly that "no means existed . . . to seek review and relief from the abusive requests" and because of that, he was forced to comply under the threat of further sanctions.[11] *Id.*; *see also id.* ¶¶ 41, 62. Swyers' Fourth Amendment claim is that "the promulgation of [the] RFIs to Swyers . . . amount[ed] to an unreasonable search within the meaning of the Fourth Amendment" and "[t]he accompanying intrusion upon the attorney-client privilege invade[d] Swyers' rights to privacy under the Fourth Amendment." *Id.* ¶ 70.

---

[9]  At the time, § 32 provided for petitions for review to be filed in the U.S. District Court for the District of Columbia.

[10]  The *Thunder Basin* Court also considered the legislative history and purpose of the Mine Act, but the PTO does not make any argument or citation to either here. The Fourth Circuit has noted that the Supreme Court did not suggest "that the legislative history stands on equal footing with the text and structure of the statute or that specific legislative history is necessary to conclude that Congress intended to preclude judicial review." *Nat'l Taxpayers Union*, 376 F.3d at 243 n.2.

[11]  This is, of course, not accurate as 37 C.F.R. § 11.2(e) provides a specific mechanism to challenge "any action or notice of any employee of the [OED] during or at the conclusion of a disciplinary investigation." Swyers quotes extensively from *Goldstein* in support of his argument, but the *Goldstein* court's comments are not relevant to the current regulations which have since been overhauled.

Essentially, Swyers argues that the OED's investigatory process was unconstitutional as applied to him.[12]

A finding of preclusion will not deny Swyers all meaningful judicial review. Swyers will be able to raise these arguments in his defense during the disciplinary proceedings (as he already has) because he can only be disciplined for failing to respond to a "lawful" RFI. 37 C.F.R. § 11.801(c). And if Swyers is not satisfied with the administrative proceeding, he has an avenue for judicial review.[13] *Cf. E. Bridge, LLC*, 320 F.3d at 89–90 ("Plaintiffs can assert all of their challenges as defenses in an agency enforcement proceeding. . . . The limitation imposed here is channeling of initial review through the administrative process, not exclusion of judicial supervision."). The constitutional nature of Swyers' claims does not require a different result. His constitutional claims will ultimately reach "an Article III court fully competent to adjudicate." *Elgin*, 113 S. Ct. at 2137; *see also Nat'l Taxpayers*, 376 F.3d at 243–44 ("In this case, even if the administrative agency elects not to decide the constitutional claims presented . . . this court can do so at the appropriate time."); *Virginia v. United States*, 74 F.3d 517, 523 (4th Cir. 1996) ("There is simply no impediment to the adjudication of constitutional issues through petitions for direct review of final agency action in the circuit courts."). In fact,

---

[12] In his opposition to the PTO's motion to dismiss, Swyers' makes multiple claims that do not appear in the complaint, including that the RFI regulation, 37 C.F.R. § 11.22(f), is "facially unconstitutional."

[13] The Court finds it significant that, by statute, the OED has a window of time within which it must bring charges. 35 U.S.C. § 32 (providing that a proceeding "shall be commenced not later than the earlier of either the date that is 10 years after the date on which the misconduct forming the basis for the proceeding occurred, or 1 year after the date on which the misconduct forming the basis for the proceeding is made known to an officer or employee of the Office"). The PTO must bring charges within a certain period of time. If it does, a practitioner will have Article III review. If the PTO does not bring charges, but the practitioner believes the investigation was overly burdensome, 37 C.F.R. § 11.22(e) provides an alternate route to challenge the OED's actions.

there are examples in the case law of district courts doing just that under § 32. *See, e.g.,* *Halvonik*, 398 F. Supp. 2d 115 (considering procedural due process claim directed at PTO's initiation of disciplinary proceedings under § 32); *Maginangell v. Lahman*, 32 F. Supp. 2d 1 (D.D.C. 1998) (considering due process and equal protection claims on petition under § 32).

Swyers claims are likewise not "wholly collateral" to the statutory review scheme. Although his claims are based on the *investigation* stage and at first glance may appear distinct from § 32, the relief Swyers seeks brings the claims squarely within the statute's purview. Specifically, the complaint asks for an injunction against "*charges* of violations of disciplinary rules based in whole or in part upon the failure of Swyers to answer to the OED's satisfaction RFIs that violate Swyers' constitutional rights." Compl. ¶ 77 (emphasis added). Thus, the claims are similar to those in *Elgin* where the Court observed that "petitioners' constitutional claims are the vehicle by which they seek to reverse the removal decisions, to return to federal employment, and to receive the compensation they would have earned but for the adverse employment action." 132 S. Ct. at 2139–40; *see also Jarkesy*, 803 F.3d at 23 ("Here, [plaintiff's] constitutional and APA claims do not arise 'outside' the SEC administrative enforcement scheme—they arise from actions the Commission took in the course of that scheme."). And they are distinct from the broad structural or systemic constitutional challenges that the Supreme Court has held to be collateral. By comparison, the challenge in *Free Enterprise* was collateral because it was not a challenge to a potential order by the Commission, but instead to the existence of the entity itself. *See Jarkesy*, 804 F.3d at 23 (noting that the *Free Enterprise* "plaintiffs were not *in* that scheme at all"); *Charles Schwab & Co. Inc. v. Fin. Indus. Regulatory Auth. Inc.*, 861 F. Supp. 2d 1063, 1078 (N.D. Cal. 2012) ("[I]n *Free Enterprise,* unlike here, the plaintiff challenged the very existence of the administrative agency, a collateral issue to any

discipline, and one which rendered meaningful review in the administrative process a practical impossibility.").

Finally, Swyers' claims fall easily within the PTO's expertise. He challenges the propriety of RFIs under PTO regulations and the determination of whether a patent practitioner violated the Code of Professional Conduct by failing to respond to an RFI. *Cf. Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 874 (D.C. Cir. 2002) (finding a claim that "require[s] interpretation of the parties' rights and duties under the Act and its regulations, . . . fall[s] squarely within the Commission's expertise").

In sum, the PTO has convinced the Court that Swyers' collateral attack on the pending PTO proceedings is precluded. *Cf. Jarkesy*, 803 F.3d at 24 ("Rather than allowing the statutory review process to run its course—a course that will eventually lead back to a court of appeals, Jarkesy has sought to make an end run around that process by going directly to district court. . . . Our obligation to respect the review process established by Congress bars us from permitting Jarkesy to make this end run, and requires dismissal of [his] district court complaint." (internal quotations and alteration omitted)); *Great Plains Coop v. Commodity Futures Trading Comm'n*, 205 F.3d 353, 355 (8th Cir. 2000) ("Allowing the target of an administrative complaint simply to file for an injunction in a federal district court would defeat the purpose of [the statute]: It would create two avenues of judicial review and would allow the plaintiff to short-circuit the administrative review process and the development of a detailed factual record by the agency."); *Chau v. S.E.C.*, 72 F. Supp. 3d 417, 425 (S.D.N.Y. 2014) ("This Court's jurisdiction is not an escape hatch for litigants to delay or derail an administrative action when statutory channels of review are entirely adequate."). On that ground, dismissal of Swyers' claims against the PTO is appropriate.

21

In his opposition, Swyers neither cites *Thunder Basin* nor explains why that framework does not apply here. He does, however, make the argument under prudential exhaustion analysis that his claims fall within each of three "exceptions."[14] First, Swyers spends pages exploring various disjointed arguments under the general assertion that his claims present a "pure question of law." Opp'n at 19–28. He also argues that he has suffered, and will continue to suffer, irreparable harm. Finally, he contends "there is no question that any administrative remedy will be futile, and will be lacking in due process." *Id.* at 29.

Even if it is the case, as Swyers seems to be arguing, that the Court should frame the question as one of exhaustion rather than preclusion, the Court would nonetheless decline to intervene in the pending proceeding. As already explained, Congress's intent that disciplinary proceedings be committed to the agency's expertise is manifest. *See Cooper v. Lee*, 86 F. Supp. 3d 480, 485 (E.D. Va. 2015) ("Courts should take particular care to adhere to the exhaustion doctrine when 'the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise.'" (quoting *McKart v. United States*, 395 U.S. 185, 194 (1969)). And no exception to exhaustion applies here. First, the mere presence of a "pure" question of law does not alone excuse exhaustion. Nor does the Court agree with Swyers' take. The claims are based on the OED's actions during a year-long investigation, which is necessarily a fact-bound inquiry. Second, the harm purportedly suffered—which amounts to litigation expense and reputational harm—does not rise to the level of an irreparable injury. *See Cooper*, 86 F. Supp. 3d at 488 (

---

[14] Swyers seems to understand the PTO's argument to be that he failed to exhaust his administrative remedies through the mechanism provided in § 11.2(e). That, of course, is not the PTO's argument, which is instead that the *statute* precludes the Court's exercise of jurisdiction to enjoin the pending disciplinary proceeding. (Although, as a factual matter, Swyers quite clearly could have used the mechanism in § 11.2(e) to challenge the RFIs during the investigation.)

"[T]he Supreme Court has held that '[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.'" (quoting *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)); *Bennett v. U.S. Sec. & Exch. Comm'n*, No. 15-cv-3325, 2015 WL 9183445, at *9 (D. Md. Dec. 17, 2015) ("[T]he time and expense of the administrative process are not grounds for proceeding instead before a district court."). Finally, even if futility applies here, Swyers has not shown it. His claims will be heard by an independent ALJ with extensive process. The outcome is far from a foregone conclusion. *See Thetford Props. IV Ltd. P'ship v. U.S. Dep't of Hous. & Urban Dev.*, 907 F.2d 445, 450 (4th Cir. 1990) ("Absent a clear showing that an administrative agency has taken a hard and fast position that makes an adverse ruling a certainty, a litigant's prognostication that he is likely to fail before an agency is not a sufficient reason to excuse the lack of exhaustion.").

Ultimately, no matter how the question is framed, "where, as here, Congress has created a particularized and comprehensive scheme for judicial and administrative review in a given context, . . . any challenge to either the scheme itself or the manner by which the agency is administering that scheme must be addressed specifically through the avenues for judicial review that Congress provided." *Abuirshaid v. Johnson*, No. 1:15-cv-1113, 2015 WL 9450612, at *4 (E.D. Va. Dec. 21, 2015) (published opinion). Accordingly, the Court will grant the PTO's motion to dismiss.

## B.   Individual Defendants' Motion to Dismiss

Swyers also seeks to hold the Individual Defendants liable in damages for their asserted unconstitutional conduct throughout the investigation pursuant to *Bivens*. The Individual Defendants move to dismiss on two grounds. First, they contend there are no facts supporting the creation of a *Bivens* remedy here. Second, they submit that, even if the court were to

23

recognize such a remedy, the Individual Defendants would nonetheless be entitled to qualified immunity. The Court agrees on both grounds and will grant the motion to dismiss.

The Supreme Court has instructed that "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances [the Court] ha[s] found a *Bivens* remedy unjustified." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007); *see also Cioca v. Rumsfeld*, 720 F.3d 505, 509 (4th Cir. 2013) (stating courts are to "review a plaintiff's invitation to imply a *Bivens* action . . . with skepticism" (internal quotations omitted)); *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012) ("The *Bivens* cause of action is not amenable to casual extension."). Assuming Swyers has identified "a constitutionally recognized interest . . . adversely affected by the actions of federal employees," a *Bivens* remedy will not be available if "any alternative existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. And in the absence of alternative processes, it must also be the case that no "special factors" are present that would counsel hesitation. *Id.*; *see also Lebron*, 670 F.3d at 548 (internal quotations omitted).

Swyers cannot proceed beyond the first step. The process provided in § 11.2(e) permits any party "dissatisfied with any action or notice of any employee of the [OED] during or at the conclusion of a disciplinary investigation" to petition the OED Director, followed by the PTO Director, and after a final decision is reached, a federal court. Despite Swyers' numerous arguments to the contrary, this provision undoubtedly includes the "oppressive" RFIs with which Swyers feels he was burdened. Swyers is also a party to ongoing disciplinary proceedings in

24

which he may raise his claims and, as explained extensively above, will ultimately be able to submit to this Court for review.

Two courts in this district have similarly declined to recognize a *Bivens* remedy against PTO employees on this ground. *See Haley v. Under Secretary of Commerce for Intellectual Prop.*, 129 F. Supp. 3d 377, 383 (E.D. Va. Sept. 8, 2015) ("[Plaintiff] has an alternate remedy because 35 U.S.C. § 32 grants [plaintiff] an opportunity to petition this Court for review of the USPTO's disciplinary decision; thus, the Court will not recognize his *Bivens* claim."); *Piccone v. U.S. Patent & Trademark Office*, 2015 WL 6499687, at *4 (E.D. Va. Oct. 27, 2005) ("Because Plaintiff's claims regarding the baseless nature and political motivations of Defendants' investigation and prosecution are questions properly raised and resolved through the thorough, entirely adequate regulatory scheme the USPTO has devised pursuant to the valid authorization of Congress, this Court will not create a *Bivens* action to create a parallel avenue for Plaintiff to recover financial damages where Congress has not done so."). Swyers' attempts to distinguish his case are unavailing. For instance, he is incorrect that the unavailability of money damages under the existing scheme warrants a *Bivens* remedy. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001) ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability."). Nor do Swyers' criticisms of various aspects of the administrative proceedings as lacking—such as the PTO's discovery rules—render it inadequate. *See W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) (declining to recognize a *Bivens* action "notwithstanding the unavailability of money damages against individual officers or the right to a jury trial" under the alternative scheme).

Finally, even if a *Bivens* remedy existed, the Court agrees that Swyers' claims could not proceed because the Individual Defendants are entitled to qualified immunity. "Qualified immunity . . . protects all government officials except those who violate a 'statutory or constitutional right that was clearly established at the time of the challenged conduct." *Jones v. Chandrasuwan*, 2016 WL 1697682, at *4 (4th Cir. 2016) (published opinion) (quoting *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014)). Assuming Swyers alleged a violation of a constitutional right—a doubtful premise—the Individual Defendants' actions did not constitute a violation of a clearly established right at the time they conducted the investigation. *See Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 205 (4th Cir. 2014) ("We may address either prong of th[e] analysis first.")

"A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jones*, 2016 WL 1697682, at *8 (internal quotation marks omitted). "While a case directly on point is not required, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted). The Individual Defendants assert there is no case law from the Supreme Court or the Fourth Circuit that would establish a violation of a clearly established right. Swyers has not identified any case law that would have put the Individual Defendants on notice that the issuance of RFIs to Swyers or contact with Swyers' clients would violate his constitutional rights. And the Court's own search has not revealed any.[15] Accordingly, the

---

[15] To the contrary, in *Bender v. Dudas*, 490 F.3d 1361, 1369 (Fed. Cir. 2007), the Federal Circuit examined a claim "that the PTO's use of RFIs in [a] disciplinary investigation lacked procedural safeguards and was therefore constitutionally defective." The Federal Circuit rejected the claim, explaining that the PTO's RFI procedure falls within the Supreme Court's recognition that "when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full

Individual Defendants are entitled to qualified immunity and the claims against them are dismissed.

## III. CONCLUSION

For the reasons stated, the PTO's Motion to Dismiss (Dkt. No. 14) and the Individual Defendants' Motion to Dismiss (Dkt. No. 17) are **GRANTED**.  An order will issue.

May    , 2016
Alexandria, Virginia

_____ /s/
Liam O'Grady
United States District Judge

---

panoply of judicial procedures be used." *Id.* (quoting *Hannah v. Larche*, 363 U.S. 420, 442 (1960)).